NORTH AMERICAN STEEL CORPORATION v SIDERIUS, INC.

1. ARBITRATION AND AWARD—QUESTIONS OF PARTIES—REMAND—VA-
   CATION OF AWARD—REHEARING—SPEEDY DISPOSITION.

   A circuit court remand of an arbitration award to the arbitration
   panel to answer questions of the parties, although not expressly
   authorized by case or court rule, is a proper procedure because
   it does not derogate from a defendant's rights and to require an
   award to be vacated and a rehearing would emasculate the
   very purpose of arbitration which is a speedy disposition of the
   controversy.

2. ARBITRATION AND AWARD—SUBSTANTIVE ARBITRABILITY—JUDICIAL
   REVIEW—ERROR.

   Ordinarily, once substantive arbitrability is determined, judicial
   review of errors of law or fact effectively ceases, and the fact
   that the arbitrators' interpretation of the law or facts may be
   erroneous is irrelevant.

3. ARBITRATION AND AWARD—SUBSTANTIVE ARBITRABILITY—APPEAL
   AND ERROR—JUDICIAL REVIEW—COURT ORDER—UNIFORM COM-
   MERCIAL CODE.

   An exception to the traditional rule of limited judicial review of
   an arbitration award after a determination of substantive
   arbitrability has been determined is in a situation where a
   court order submitting the matter to arbitration provides that
   no judgment or decision of the arbitration panel shall be
   entered which is at variance with the Uniform Commercial
   Code; in such a case the Court of Appeals must determine
   whether the award conformed to the rules of the Uniform
   Commercial Code.

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Arbitration and Award § 167 *et seq.*
[2, 3] 5 Am Jur 2d, Arbitration and Award § 145.
[4, 5] 67 Am Jur 2d, Sales § 386.
   Construction and effect of UCC Art 2, dealing with sales. 17 ALR3d
   1010.
[6] 67 Am Jur 2d, Sales § 532.
[7] 67 Am Jur 2d, Sales § 693.
[8] 5 Am Jur 2d, Arbitration and Award §§ 89, 98, 100, 101.

4. Sales—Contracts—Rejection of Goods—Price Adjustment—
   Falling Market—Statutes.

   A plaintiff is entitled to reject an entire shipment of goods where
   the limited remedy of trade usage price adjustment fails in its
   essential purpose due to a defendant's refusal to grant a price
   adjustment in a falling market (MCLA 440.2719; MSA 19.2719).

5. Sales—Contracts—Acceptance of Goods—Rejection of Goods—
   Nonconforming Goods—Notification—Reasonable Notice.

   Conditional acceptance of goods where the goods are nonconform-
   ing requires rejection and notification within a reasonable time;
   notification within a reasonable time depends upon the nature,
   purpose and circumstances of the action (MCLA 440.1204[2];
   MSA 19.1204[2]).

6. Arbitration and Award—Sales—Contracts—Products—Speci-
   fied Class.

   A conclusion by an arbitration panel that a contract called for
   delivery of a product a certain class is not erroneous where
   the documents representing the sales contract between the
   parties either expressly or impliedly, via industry standards,
   refer to the product as being in the specified class.

7. Sales—Contracts—Acceptance of Goods—Rejected Goods—
   Nonconforming Goods—Sales Commission—Damages.

   Resale of rejected or nonconforming goods with a sales commis-
   sion does not constitute an acceptance of the goods where there
   is sufficient notification communicated to the seller of an inten-
   tion to resell, and an arbitration panel may properly allow
   sales commissions as damages resulting from the seller's breach
   (MCLA 440.2604, 440.2715[1]; MSA 19.2604, 19.2715[1]).

8. Arbitration and Award—Arbiter—Bias—Evidence—Certain
   and Direct Evidence.

   The partiality or bias of an arbiter which will overturn an
   arbitration award must be certain and direct, and not remote,
   uncertain or speculative.

Appeal from Wayne, John R. Kirwan, J. Submitted January 10, 1977, at Detroit. (Docket No. 27702.) Decided May 3, 1977. Leave to appeal applied for.

Complaint by North American Steel Corporation against Siderius, Inc., for damages for breach of contract and to enjoin payment on a letter of

credit. The circuit court enjoined payment and submitted the matter to arbitration. Award for plaintiff was confirmed by the circuit court. Defendant appeals. Affirmed.

*Katz, Victor & Yolles,* for plaintiff.

*Bodman, Longley, Bogle, Armstrong & Dahling* (by *Walter Koch)* and *Pavia & Harcourt* (by *David A. Botwinik),* for defendant.

Before: M. J. KELLY, P. J., and N. J. KAUFMAN and D. F. WALSH, JJ.

N. J. KAUFMAN, J. Defendant Siderius, a New York corporation maintaining offices in Detroit, acts as the exclusive sales representative for an Italian steel mill. On August 21, 1974, Mr. John Cone, acting on behalf of plaintiff North American Steel Corporation, appeared in defendant's Detroit office and delivered to a Mr. Thomas Vyn, the head of Siderius' Detroit office at the time, a "purchase order" of plaintiffs. Plaintiff's order specified a request for approximately 4,150 tons of steel at a price of about $360 per ton. The purchase order described the steel as follows:

"#1—Mild Commercial Quality (B 55 Max. rockwell 'B' scale).
"#2—Class I skin passed."

Mr. Vyn claimed that he told Cone that the second requirement, that the steel be "Class I", was "not guaranteed" by defendant and, furthermore, that Cone agreed to the modification. On the other hand, Mr. Cone claimed that the purchase order was handed over to Vyn in an envelope and that no conversation between him and Vyn occur-

red. Moreover, Cone claimed that in an earlier telephone conversation Vyn agreed that the steel delivered to plaintiff was, in fact, to be "Class I". No written memorandum or confirmation of Vyn's purported conversation was sent to either Cone or plaintiff.

The purchase order was delivered by Vyn to defendant's New York agent, Mr. Filippo Gabbani. Gabbani received the purchase order and noted on the face of it the oral changes allegedly agreed to between Cone and Vyn. Vyn informed Gabbani that the formal changes in the purchase order would be made by plaintiff through its follow up letter of credit. Mr. Joseph Garcia, defendant's employee, received plaintiff's letter of credit on September 6, 1974, in the amount of $1,648,000, the total price of the contract. The letter of credit stated in part:

"The credit covers the value of: approx. 4164 metric tons cold rolled steel sheets in coil, commercial quality per Purchase Order No. 9308, dated August 21, 1974, CIF duty paid, loaded on trucks, Detroit dock."

Mr. Garcia prepared a telex for defendant to send to plaintiff in regard to certain deficiencies in the text of the letter of credit. It read in part:

"We acknowledge receipt of L/C and take exception to the following

"1—'Loaded on Trucks'

"2—'Payment 45 days after vessel arrival'

"Terms of sale are 'Terminal and/or handling charges are for your account and payable 30 days'.

"*All other terms on L/C are in order*

"Please amend the above clauses to conform with order.

"Thank you.

"Siderius." (Emphasis added.)

Defendant then sent plaintiff a "Sales Confirmation" and specifications which described the steel as:

"Cold rolled coils, in commercial quality, matte finish, mill edges, coming from stock."

Thereafter, the steel was shipped from Italy and arrived in Detroit on November 8, 1974. Upon arrival, it was loaded directly onto plaintiff's trucks and moved to its warehouse in Detroit. The inspection process began and plaintiff informed defendant that the steel was not Class I as contracted for. Defendant replied that Class I had not been guaranteed.

After plaintiff completed inspection of the steel, negotiations ensued looking toward a price adjustment because of the quality of the steel. During the negotiations, plaintiff resold a small portion of the steel. The negotiations proved fruitless and on December 4, 1974, plaintiff informed the defendant, via a telephone conversation, to take the steel back and that the deal was off. On December 12, 1974, the plaintiff sent defendant a letter which stated in part:

"7. We hereby revoke our acceptance of the entire shipment and reject all this merchandise. To the extent that a shipment was made to our customer as above set forth we will adjust that item.

"8. We will accept any reasonable instructions which you will give us with respect to the steel. In this connection, we wish to point out that the market for steel has declined precipitously and that you should furnish these instructions expeditiously.

\*   \*   \*

"10. If you do not give us instructions within a reasonable period of time, we will sell the said steel for your account."

On December 6, 1974, the plaintiff instituted proceedings in the Wayne County Circuit Court to enjoin both the defendant from presenting plaintiff's irrevocable standby letter of credit and the bank, which had opened the credit, from making payment. Plaintiff's complaint was grounded upon breach of contract by defendant. On December 13, 1974, the circuit court enjoined the bank from making payment on the letter of credit in consideration of plaintiff's deposit with the court of a letter of credit in the amount of $1,636,261.56. On December 27, 1974, after several days of hearing before the circuit court, the parties agreed to an order signed by Judge Kirwan submitting the matter to arbitration. The order provided, in pertinent part, the following:

"H. That except for those matters within the jurisdiction of the Court, all matters in dispute between the parties are herewith referred to American Arbitration Association for adjudication and determination in accordance with its rules provided, however, that the arbitrator(s) shall make specific findings of fact, which specific findings of fact shall include the answers to the questions posed in Exhibit 1 attached hereto and made a part hereof.

\* \* \*

"M. That the decision of the arbitrator(s) shall be based upon and governed by the Uniform Commercial Code. That no decision or judgment shall be entered which is at variance with the Uniform Commercial Code.

"N. That the decision of the arbitrator(s) shall be in writing, shall make findings of fact and conclusions of law and shall specifically answer the questions submitted on Exhibit 1 plus all questions which either of the

parties may submit in writing prior to the commencement of the arbitration hearings.

"O. That a copy of the said signed arbitration award with the findings of fact and conclusions of law shall be transmitted to this Court for review.

"P. That this Court reserves jurisdiction over the cause of action and the Court shall have the right to reject, modify or change the arbitration award in the event there is any nonconformity with the terms of this order or the findings made by this Court."

On July 28, 1975, after the arbitration hearings concluded, the arbitration panel awarded the plaintiff $1,621,699.69. Thereafter, plaintiff sought confirmation of the award and defendant countered seeking vacation. Defendant's grounds for vacation were as follows:

1.) The arbitrators failed to make specific findings of fact as provided for in the order of December 27, 1974.

2.) The arbitrators failed to specifically answer questions submitted by the parties as per court order of December 27, 1974.

3.) The arbitrators failed to follow the Uniform Commercial Code as per court order of December 27, 1974.

4.) One of the arbitrators, Victor Besso, was biased against the defendant.

The circuit court remanded the matter to the arbitration panel to answer the questions submitted by the parties, as required by court order, and reserved its decisions concerning confirmation or vacation until the panel's answers to these specific questions were received. Upon the panel's completion of the answers to the questions submitted by the parties, the matter was resubmitted to the circuit court. On February 11, 1976, the court confirmed the award, rejecting defendant's afore-

mentioned claims, and entered judgment in the amount of $854,218.80 for the plaintiff.[1]

Defendant filed claim of appeal to this Court on March 1, 1976. On March 5, 1976, the circuit court ordered that the escrowed funds, now totaling $887,706.26, be released to the plaintiff in return for a $867,015.50 letter of credit which would be cancelled should the plaintiff prevail in this Court. The release of these escrowed funds satisfied the plaintiff's judgment. The circuit court further ordered that the plaintiff pay the annual premium of $13,005.23 on its letter of credit deposited with the court and that defendant file an appeal bond in the amount of $45,000 to cover the plaintiff's taxable costs.

On appeal, defendant again asserts entitlement to vacation of the award in favor of plaintiff. Plaintiff retorts by requesting affirmance of the decision below plus costs which, plaintiff claims, should include $13,005.23 per annum premium costs on the letter of credit deposited below.

Initially, defendant argues that the procedure mandated by the court in submitting this controversy to arbitration specifically required the arbitration panel to answer questions submitted by the parties and to make specific findings of fact. Thus, the arbitrators' failure to do so, defendant urges, negated the agreed upon procedure and requires vacation of the arbitration award. Further, defendant argues, the court erred in remanding to the arbitration panel to specifically answer the ques-

---

[1] Apparently, the amount of the judgment was reached by subtracting the aggregate resales of the steel by the plaintiff, totaling $870,506.96, from the original contract price of $1,648,000 and then adding to this amount interest and other charges of the plaintiff in effecting the resales in accordance with MCLA 440.2711(3), 440.2706(1); MSA 19.2711(3), 19.2706(1). See *Miller v Royer Buick Inc,* 51 Pa DC C2d 596; 9 UCC Rep 691 (1971).

tions of the parties as the court was without power to remand.

Although no Michigan case or court rule can be found expressly authorizing a remand to an arbitration panel, the procedure followed by the court was proper.[2] The arbitration panel appears to have in good faith attempted to answer all the questions of the parties raised by their 49-page opinion and upon remand complied with the court's instructions. To require the award to be vacated and a rehearing held would be to emasculate the very purpose of the arbitration—speedy disposition of the controversy. The arbitrators had complied with the substance of the court's order. The only matter remaining was to shape that substance into the form requested by the parties and the court. Remand was the proper procedure to be followed by the court concerning the failure to answer specific questions of the parties, and was not in derogation of any rights of the defendant.

Next, defendant contends the arbitration panel failed to adhere to the UCC in granting its award to the plaintiff and, therefore, the circuit court was in error in entering judgment on the award. For this proposition, defendant relies on the order of submission which, as noted above, stated that "no decision or judgment shall be entered which is at variance with the Uniform Commercial Code".

Ordinarily, once substantive arbitrability is determined, judicial review of errors of law or fact effectively ceases, except as to the limited grounds set forth in GCR 1963, 769.9, and the fact that the

___

[2] We think it important to note that the procedure employed by the trial judge in the instant case is commonly utilized by the Federal courts when faced with labor arbitration awards which need clarification. *See, e.g., Hearst Guild Local 25 v Hearst Corp,* 481 F2d 821 (CA 5, 1973), *IBEW, Local 369 v Olin Corp,* 471 F2d 468 (CA 6, 1972), *USW v Timken Roller Bearing Co.,* 324 F2d 738 (CA 6, 1963).

arbitrators' interpretation of the law or facts may be erroneous is irrelevant. *Ferndale Education Association v School District for the City of Ferndale #1,* 67 Mich App 637; 242 NW2d 478 (1976). However, since the court order submitting the matter to arbitration provided "no judgment or decision shall be entered which is at variance with the Uniform Commercial Code", the traditional rule is not applicable and we are required to determine whether the award conformed to the rules of the Uniform Commercial Code.

Defendant's first argument under this general heading is that the arbitrators improperly applied the UCC in failing to limit the award to a reasonable price adjustment, once this was found to be the accepted trade usage for delivery of nonconforming steel.

The arbitrators found that price adjustments for delivery of nonconforming steel was an accepted trade usage. However, the panel also found that the price adjustment was refused by the defendant and that as a result the plaintiff had the right to reject the goods.

It is clear that defendant is correct in asserting that this particular trade usage was part of the contract and acted as a contractual limitation of the rejection remedy of the buyer under MCLA 440.2601; MSA 19.2601. See MCLA 440.2508; MSA 19.2508 (Official Comment 4). This is not the end of our inquiry, however.

In the case at bar, the arbitration panel correctly found the price adjustment remedy failed because defendant refused to grant an adjustment, the price of Class II steel was falling and the market for Class II steel was a narrow one. Therefore, under UCC 2-719, the limited remedy of trade usage price adjustment failed in its essential pur-

pose and, therefore, plaintiff was entitled to reject the entire shipment according to UCC 2-601. MCLA 440.2719; MSA 19.2719 (Official Comment 1).

Next, defendant contends the panel erred in finding that plaintiff properly rejected the goods and provided timely notification of this to the defendant.

The arbitrators found an acceptance did not occur. This finding was correct since the plaintiff did not state in its communications that the goods would be accepted in spite of the nonconformity but, rather, that they would be accepted with a price adjustment. This was a conditional communication of acceptance subject to the expressed condition of effecting a price adjustment. See MCLA 440.2608; MSA 19.2608 (Official Comment 3).

The goods arrived November 8, 1974. Rejection took place December 4, 1974. Notification was given on December 12, 1974. According to the UCC, what is a "reasonable time" depends upon "the nature, purpose and circumstances" of the action. MCLA 440.1204(2); MSA 19.1204(2). In view of the attempts made to effectuate a price adjustment, once inspection was completed and the goods were determined to be nonconforming, the arbitration panel correctly found that rejection and notification came within a reasonable time and was proper. MCLA 440.2602(1); MSA 19.2602(1).

Defendant next contends the arbitrators erred in concluding the contract called for delivery of Class I steel. Defendant goes through an elaborate discussion of its view of the contract formation, relying heavily upon Vyn's claim of communication to Cone concerning the absence of guarantee as to the quality of the steel. The arbitration panel

believed neither party entirely and relied upon the documents to determine the terms of the contract. The purchase order of plaintiff and the sales confirmation of defendant both described the steel, either expressly or by implication, as Class I. The seller's telex in response to the buyer's letter of credit did not object to the buyer's description of the steel in the purchase order as Class I. Furthermore, the letter of credit expressly referred to the buyer's purchase order, and impliedly, via industry standards, was susceptible to the construction that the steel was to be Class I. Although some controversy exists as to what was communicated in the conversations between Vyn and Cone, all the documents representing the sales contract between the parties either expressly or impliedly, again via industry standards, refer to the steel as Class I. The panel committed no error in finding the contract to call for delivery of Class I steel.

Defendant's final contention concerning error in the arbitrators' alleged failure to follow the UCC is that the arbitrators erred in allowing the plaintiff a sales commission on the goods resold by plaintiff since defendant was without notice of the sales and such resale constituted an acceptance of those goods.

The order submitting the matter to arbitration stated that the plaintiff would have the right to make sales and deliveries of the steel and keep books and accounts.

Moreover, as noted above, on December 12, 1974, plaintiff sent defendant a letter stating in Paragraph 10:

"If you do not give us instructions within a reasonable period of time, we will sell the said steel for your account."

No instructions were forthcoming and the steel was resold. This letter, together with the order or submission of December 27, 1974, constitute sufficient notification of intention to resell under UCC 2-706 and was not an acceptance of the goods. MCLA 440.2604; MSA 19.2604. Notice of each individual resale need not be given as it is the intention to resell which must be communicated. The arbitration panel properly allowed sales commissions as damages resulting from the seller's breach. See MCLA 440.2715(1); MSA 19.2715(1).

In conclusion, all errors alleged by the defendant concerning improper application of the UCC to the facts of the controversy are simply unsupported by the facts as found or by the Uniform Commercial Code as applied.

Finally, the defendant contends that one of the arbitrators, Victor Besso, continued to participate in the proceedings after his company's subsidiary commenced a lawsuit against defendant. Further, defendant argues that Besso failed to make a full disclosure of his independent investigation of the facts relating to the arbitration. This nondisclosure, we are told, constituted misbehavior, prejudicing defendant's rights, which mandates that the arbitration award be vacated.

Defendant now claims Mr. Besso was prejudiced against defendant within the meaning of GCR 1963, 769.9(1)(b).[3] The gist of the prejudice is as follows: Victor Besso was Vice President of Intsel Corporation. Intsel Corporation controlled Interna-

---

[3] GCR 1963, 769.9(1)(b) provides:

"(1) Upon application of a party, the court shall vacate an award where:

* * *

"(b) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party."

tional Steel Corporation, a subsidiary of Intsel. Michael Harrington was an employee of International Steel. Harrington quit International Steel sometime in July, 1975, and went to work for a subsidiary of defendant. On September 11, 1975, International Steel brought suit against Harrington and defendant based on allegations of unfair competition in the hiring of Harrington. Defendant claims that Besso discussed the matter of arbitration with Harrington prior to the hearings in April of 1975 and that these conversations prejudiced Besso against the defendant. However, many of defendant's claims of prejudice relate to events subsequent to the arbitrators' award of July 28, 1975, and, as defendant concedes, are based upon pure speculation.

No case can be found in Michigan factually consonant with the case at bar in terms of alleged prejudice by an arbitrator. See *Mather v Day,* 106 Mich 371; 64 NW 198 (1895), *Gallagher v Kern,* 31 Mich 138 (1875).

However, it seems well established that the partiality or bias which will overturn an arbitration award must be certain and direct, and not remote, uncertain or speculative. Annotation: *Setting Aside Arbitration Award on Grounds of Interest or Bias of Arbitrators,* 56 ALR3d 697. Thus, while it is conceded that arbitrators must disclose to the parties any dealings that might create an impression of possible bias, the impression must be a reasonable one. It is not any undisclosed relationship, no matter how peripheral, superficial or insignificant, that compels vacation on the grounds of partiality or prejudice. *Cross Properties, Inc, v Gimbel Bros, Inc,* 15 App Div 2d 913 (NY, 1962), *William B Lucke, Inc v Spiegel,* 131 Ill App 2d 532; 266 NE2d 504 (1970).

In the case at bar, assuming, *arguendo,* that Besso spoke with Harrington concerning the arbitration prior to the hearings in April, 1975, any claims of prejudice or partiality by Besso against the defendant on the basis of the alleged previous Besso-Harrington conversations, are at best speculative. Besso was employed in New York and Harrington in Texas. Harrington left International Steel to work for defendant's subsidiary sometime in July of 1975. Whether Harrington's departure was before the arbitration decision is uncertain. Suit was filed by International Steel against the defendant in September, 1975, approximately two months after the award. There is no allegation by defendant that any contact between Besso and Harrington occurred subsequent to commencement of the hearings. Further, if Besso did speak with Harrington and prejudice resulted because of these conversations, it is more plausible that Harrington's comments prejudiced the plaintiff and not the defendant. If Harrington was leaving plaintiff's subsidiary to work for the defendant's subsidiary, is it not reasonable to assume that Harrington would say nothing to prejudice his future employer?

Finally, it would be absurd to require an arbitrator to provide the parties with a complete and unexpurgated business biography. *Sanko SS Co v Cook Industries, Inc,* 352 F Supp 386 (SD NY, 1972). In the same vein, it would be absurd to require vacation of an arbitration award based on partiality where it is subsequent actions of a third party, such as those of Harrington in the case at bar, that establish the relationship alleged to be prejudicial. The court was correct in refusing to vacate the arbitration award as the partiality alleged by defendant was, at best, speculative,

indirect, remote and based upon a relationship which developed subsequent to the award by the arbitrators.

Affirmed. Costs to plaintiff. When plaintiff files his bill of costs to the clerk of the court within 30 days from the date of this opinion, pursuant to GCR 1963, 526.10[2], he should include the cost of the letter of credit incurred as a result of this appeal.